## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| PREPAID TECHNOLOGIES LLC, individually, and on behalf of all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | **Related Case:  1:14-md-02583-TWT** |
| | **DEMAND FOR JURY TRIAL** |
| vs. | |
| HOME DEPOT U.S.A., Inc., a Delaware corporation, | |
| Defendant. | |

Plaintiff PREPAID TECHNOLOGIES LLC ("Plaintiff"), by and through its attorneys, upon personal knowledge as to itself and its own acts and experiences, and upon information and belief as to all other matters, alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this Class Action Complaint ("Complaint") against Defendant Home Depot U.S.A., Inc. ("Home Depot") for its negligent failure to properly safeguard shoppers' sensitive personally-identifiable information ("PII"), including cardholder names, credit card numbers, expiration dates, cardholder verification values and service codes for customer purchases made at Home Depot stores – and its failure to provide clear, conspicuous and timely notice to Plaintiff

CLASS ACTION COMPLAINT

and other members of the class that their cardholders' information had been stolen.

2.     Home Depot has more than 2,200 retail stores in the United States (including Puerto Rico and the U.S. Virgin Islands and the territory of Guam), Canada and Mexico.  Beginning in or about April, 2014, and continuing until at least September 2, 2014, or perhaps as late as September 18, 2014, the payment data systems that process transactions for all Home Depot retail stores were breached by unknown criminals.  The theft resulted in the largest known data breach of a retail company's computer network and could affect as many as 60 million credit card accounts.

3.     Home Depot did not disclose the criminal intrusion of its customer data systems until months after it had occurred, and only after a respected security blogger published a story revealing the breach. Even after various reliable sources revealed the breach, Home Depot initially refused to confirm or deny that the breach had occurred.[1]

4.     In its initial Frequently Asked Questions ("FAQs") confirming the breach, Home Depot failed to identify the type of information stolen to assist Plaintiff and members of the class in protecting their cardholders' PII.  Indeed, in

---

[1] http://krebsonsecurity.com/2014/09/banks-credit-card-breach-at-home-depot/

answer to the question "Is it safe to purchase at The Home Depot?," the company failed to include a warning that its payment security protection technology remained vulnerable to attack by hackers.[2]

5.     More than two weeks after Home Depot was notified of "unusual activity" connected to its payment systems, and nearly six months after the criminal intrusion, Home Depot finally announced that its systems had been updated with new technology to encrypt raw payment card data, making it unreadable and "virtually useless to hackers," an apparent admission that the information stolen was unencrypted and thus highly valuable to the hackers.

6.     As a direct result of Home Depot's negligent conduct, Plaintiff and other members of the proposed Class have incurred damages, and will incur future damages, for the following:  (1) reissuing debit and/or credit cards, (2) covering the cost of fraudulent charges, (3) notifying cardholders of the breach, and (4) handling cardholder inquiries and investigations related to the breach.

## PARTIES

7.     Plaintiff Prepaid Technologies LLC is a limited liability company headquartered in Birmingham, Alabama.  Plaintiff provides its cardholders with

---

[2]  https://corporate.homedepot.com/MediaCenter/Documents/FAQs.pdf

debit and/or credit cards equipped with magnetic strips containing sensitive financial data.

8.       As a result of the security breach, Plaintiff has incurred damages for, among other things, the cost of replacement cards and the reimbursement of fraudulent transactions.  These costs are ongoing, as Plaintiff continues to investigate fraudulent transactions caused by the data breach that have not yet been reimbursed.

9.       Defendant Home Depot, U.S.A. Inc., a Delaware corporation headquartered in Atlanta, Georgia, does business throughout this District, and the United States.

## JURISDICTION AND VENUE

10.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (a) at least one member of the putative class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under the subsection apply to this action.

11.       This Court has personal jurisdiction over Defendant because it conducts significant business in this District, and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's Complaint occurred in this District.

## FACTUAL BACKGROUND

**Home Depot Failed to Detect the Data Breach for Several Months, Resulting in the Compromise of At Least 56 Million Unique Payment Cards, and Over $3 Billion in Fraud**

13.     Home Depot is the world's largest home improvement specialty retailer with fiscal 2013 retail sales of $78.8 billion and earnings of $5.4 billion.

14.     As early as April, 2014, criminal hackers gained access to Home Depot's payment data systems and stole credit and debit card information for about 60 million Home Depot shoppers.

15.     Approximately five months later, on September 2, 2014, experts reported seeing "evidence that Home Depot stores may be the source of a massive new batch of stolen credit and debit cards that went on sale in the cybercrime underground."[3]  By then, Home Depot had yet to publicly announce the breach, though when contacted on September 2, a Home Depot spokesperson confirmed

---

[3] http://krebsonsecurity.com/2014/09/banks-credit-card-breach-at-home-depot/

that the company was investigating but would neither confirm nor deny that a breach had occurred.  *Id.*

16.    On September 8, 2014, Home Depot issued a vague press release confirming the breach of its payment data systems and advising that the company "continues to determine the full scope, scale and impact of the breach."[4]  Despite the serious and immediate threat of future harm to financial institutions and their cardholders, Home Depot's notice failed to describe, *e.g.* the nature of the information stolen, whether its systems' vulnerability had been resolved, and how many shoppers were affected.

17.    Even though Home Depot was quick to assure cardholders that no debit card PIN data was compromised in the break-in, multiple financial institutions were reporting a steep increase over the past few days in fraudulent ATM withdrawals on customer accounts.[5]

18.    In an undated "Notice to Our Customers," Home Depot announced that on September 8, 2014, the breach had been confirmed and payment card information such as name, credit card number, expiration date, cardholder

---

[4] https://corporate.homedepot.com/MediaCenter/Documents/Press%20Release.pdf
[5] http://krebsonsecurity.com/2014/09/in-wake-of-confirmed-breach-at-home-depot-banks-see-spike-in-pin-debit-card-fraud/

verification value and service code for purchases made at Home Depot stores from April, 2014 on, may have been compromised.[6]  Although Home Depot stated "we have taken aggressive steps to address the malware and protect customer data[,]" it failed to confirm that the vulnerability of its data systems was contained or otherwise resolved.  At the time of the Notice, Home Depot customers' private and highly sensitive payment data residing in the retailer's point of sale systems remained vulnerable to attack by hackers.

19.    On September 10, 2014, experts predicted that the security breach affected nearly every Home Depot store in the United States and was likely to expose approximately 60 million accounts and result in $2 billion to $3 billion in fraud.[7]

20.    Home Depot did not confirm that the hackers' method of entry had been closed off, and the malware eliminated from its systems, until September 18, 2014, approximately 6 months after the intrusion. In its FAQs, the retailer announced "we have fixed the breach."[8]  And in its press release, Home Depot

---

[6] https://corporate.homedepot.com/MediaCenter/Documents/Important%20Customer%20Notice.pdf

[7]  http://blog.billguard.com/2014/09/home-depot-data-breach-estimated-impact/

[8] https://corporate.homedepot.com/MediaCenter/Documents/FAQs.pdf

admitted for the first time that its customers' PII had been stored in usable form: the installation of a "new payment security protection locks down payment data through enhanced encryption, which takes raw payment card information and scrambles it to make it unreadable and virtually useless to hackers."[9]

21.     Before then, Plaintiff and members of the class were never warned that if their cardholders used their credit and debit cards to make purchases at Home Depot, shopper PII was not encrypted, and therefore readable and useful to criminal intruders.

**Home Depot Customers' PII Sold in the Cybercrime Shops Leads to Fraudulent Charges**

22.     The theft of nearly 60 million Home Depot customers' PII has significantly exposed those customers to the threat of substantial harm. Sources have confirmed that the thieves have taken the stolen data of Home Depot customer credit and debit cards and attempted to sell the information in underground markets.

23.     The stolen Home Depot card data for sale in the underground markets allows thieves to create counterfeit copies of debit and credit cards that can be used to purchase merchandise in big box stores.  And if the thieves who buy stolen debit

---

[9] https://corporate.homedepot.com/MediaCenter/Documents/Press%20Release.pdf

cards also are able to change the PIN on those accounts, the fabricated debit cards can then be used to withdraw cash from ATMs.[10]

24.    The card data stolen from Home Depot customers and placed for sale on the crime shop Rescator[dot]cc includes both the information needed to fabricate counterfeit cards as well as the legitimate cardholder's full name and the city, state and zip code of the Home Depot store from which the card was stolen (presumably by malware installed on some part of the retailer's network, and probably on each point-of-sale device).  This is especially helpful for fraudsters since most Home Depot transactions are likely to occur in the same or nearby zip code as the cardholder. The zip code data of the store is important because it allows the criminals to quickly and more accurately locate the Social Security number and date of birth of cardholders using criminal services in the underground that sell this information.

25.    On September 12, 2014, Minnesota's Star Tribune reported that "[a]t least 12,000 credit and debit cards believed stolen from Home Depot and linked to

---

[10] http://krebsonsecurity.com/2014/09/in-wake-of-confirmed-breach-at-home-depot-banks-see-spike-in-pin-debit-card-fraud/

Minnesota zip codes are for sale at the underground crime shop Rescator, a local cybercrime professional says.  The stolen cards sell for around $9 to $52 each."[11]

26.     BillGuard, a personal finance security service, analyzed its data to assess the scope of the Home Depot breach and to find any clear patterns of fraud. Based on its data, Home Depot's statements, Krebs' analysis, and industry analysis, it estimated that approximately 60 million accounts were exposed in the Home Depot breach, and that $2-3 billion in fraud is likely to strike the compromised accounts overall.[12]

27.     On September 23, 2104, the *Wall Street Journal* reported that fraudulent transactions were showing up across the U.S. as criminals use the stolen card information to buy prepaid cards, electronics and even groceries, and in some cases, drain cash from customer bank accounts.[13]

28.     By one estimate, the data sold on black markets could be used to make $3 billion in illegal purchases.[14]

---

[11] http://www.startribune.com/local/274834671.html

[12] http://blog.billguard.com/2014/09/home-depot-data-breach-estimated-impact/

[13] http://online.wsj.com/articles/fraudulent-transactions-surface-in-wake-of-home-depot-breach-1411506081

[14] http://www.nytimes.com/2014/09/20/business/ex-employees-say-home-depot-left-data-vulnerable.html

**Years Earlier Computer Experts Inside Home Depot Knew Its Systems Were Easy Prey for Hackers**

29.     According to former employees interviewed by the *New York Times*, Home Depot was slow to respond to early threats to its systems even though the risks were clear to computer experts inside Home Depot.  But despite alarms as far back as 2008, Home Depot was slow to raise its defenses.[15]

30.     In 2012, Home Depot hired a computer engineer to help oversee security at its 2,200 stores.  But this year, as hackers struck other retailers, that engineer was sentenced to four years in federal prison for deliberately disabling computers at the company where he previously worked.  *Id.*

31.     Former members of Home Depot's security group suggest that its managers failed to take threats of data breach "as seriously as they should have." They said managers relied on outdated antivirus software from 2007 and failed to continuously monitor the retailer's network for unusual behavior.  Vulnerability scans were "irregularly" performed on computer systems inside the stores, and even then, only in a small number of the stores.  *Id.*

---

[15] http://www.nytimes.com/2014/09/20/business/ex-employees-say-home-depot-left-data-vulnerable.html

32.    Credit card industry security rules require large retailers like Home Depot to conduct such scans at least once a quarter, using technologies approved by the PCI Security Standards Council.  The PCI Council requires that approved, third party quality assessors perform routine tests to ensure that merchants are compliant.

33.    Bloomberg reported that "[i]n the year before cybercriminals penetrated payment systems of Home Depot stores in the U.S. and Canada, the retailer suffered at least two smaller hacks, according to internal company e-mails and reports. Afterward, Home Depot security contractors urged the company to strengthen its cyber defenses by activating a key, unused feature of its security software that the internal documents say would have added a layer of protection to the retail terminals where customers swipe their cards."[16]

34.    Internal Home Depot documents show the Atlanta-based retailer had chosen to keep the extra security measure deactivated even though it was designed

---

[16] http://www.businessweek.com/articles/2014-09-18/home-depot-hacked-wide-open

specifically to spot the kind of malicious software that attacks systems' endpoints, like the registers that were hit at Target, Michaels, Neiman Marcus, and others.[17]

35.     Security consultants urged Home Depot several times from August 2013 to February 2014 to turn on an Endpoint Protection feature, the internal documents say. According to an Oct. 1, 2013, report prepared for Home Depot by consultant FishNet Security, the retailer left its computers vulnerable by switching off Symantec's Network Threat Protection (NTP) firewall in favor of one packaged with Windows. "It is highly advised and recommended the NTP Firewall component be deployed and that Windows Firewall be discontinued," the report states. For intrusion prevention to work properly, it says, NTP was needed on all Home Depot computers, including register payment terminals. Instead, the company kept the protection off its registers and continued to scan for suspicious activities at the network level, say the internal documents.[18]

36.     The Huffington Post reported that Home Depot's security team had been understaffed and overwhelmed for years. A former security employee told the

---

[17] http://www.businessweek.com/articles/2014-09-18/home-depot-hacked-wide-open

[18] http://www.businessweek.com/articles/2014-09-18/home-depot-hacked-wide-open

publication that he had raised "red flags" with Home Depot's management about the lack of encryption.[19] He said he thought that flaw violated payment card industry security standards. But he said management didn't address his concerns, and he quit last year.

**Home Depot Had an Obligation to Use Industry Standards to Protect Customer PII**

37.     Home Depot's Privacy and Security Statement (the "Security Statement") promises shoppers that Home Depot "values and respects the privacy of its customers and visitors."  The Security Statement applies to "our interactions with our customers and visitors, including, "visits to our stores."[20]  Under the heading "Security," Home Depot reassures shoppers that it employs the use of "SSL technology, an industry standard … designed to prevent someone other than operators of our websites from capturing and viewing your personal information."

38.     Home Depot's chairman and CEO is a member of the Board of Directors of the Retail Industry Leaders Association ("RILA").  In January, 2014, RILA announced its "commitment to cybersecurity and data privacy by launching a comprehensive initiative to address evolving cyber-threats and to promote

---

[19] http://www.huffingtonpost.com/2014/09/24/home-depot-security-team-_n_5874178.html

[20]  http://www.homedepot.com/c/Privacy_Security

additional safeguards for personal data in the payment ecosystem."[21]

39.     The Payment Card Industry Data Security Standard (PCI DSS) is a widely accepted set of policies and procedures intended to optimize the security of credit, debit and cash card transactions and protect cardholders against misuse of their personal information. The PCI DSS was created jointly in 2004 by four major credit-card companies: Visa, MasterCard, Discover and American Express.

40.     Home Depot falsely represented that it "meets all current standards for PCI DSS, which ensures that no customer credit account data is stored in any usable form."[22]  According to the retailer, the PCI DSS is "a multi-faceted security standard that includes requirements for security management, policies, procedures, network architecture, software design and other critical measures."  *Id.*

41.     Retailers in the United States that take credit cards are expected to be compliant with the PCI DSS, which should potentially limit the risk of data breaches. Eric Cowperthwaite, vice president of advanced security and strategy at Core Security, told eWEEK that it would appear, based on what is known, that

---

[21]  http://www.rila.org/news/topnews/Pages/RetailersExpandtheirCommitmentto CybersecurityandDataPrivacy.aspx

[22] http://www.homedepot.com/hdus/en_US/DTCCOM/HomePage/Superfeatures /Miscellaneous/U.S._Communities/Docs/USCommEnrollForm.pdf

---

Home Depot should have been better prepared and likely they are not fully PCI

DSS-compliant.[23]

**As A Result Of Home Depot's Lax Security Measures, Businesses Have Been Forced To Protect Their Cardholders And Avoid Fraud Losses**

42.     Home Depot's data breach has affected at least 56 million unique

payment cards and, as a result, has forced businesses to incur substantial losses.

These damages include the costs of monitoring and preventing fraud, notifying

cardholders of compromised cards and purchasing and mailing replacement cards,

forgone fees, and the cost of reimbursing cardholders for fraudulent transactions.

## CLASS ALLEGATIONS

43.     Plaintiff Prepaid Technologies brings this action pursuant to Fed. R.

Civ. P. 23(b)(2) and (3) on behalf of itself and a Class of similarly situated

businesses, defined as:

> All entities in the United States (including its Territories and the District of Columbia) who issue payment cards (including debit or credit cards) or who perform, facilitate, or support card issuing services, whose cardholders made purchases from Home Depot stores from April 1, 2014 to the present (the "Class") and were damaged thereby.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action

---

[23] http://www.eweek.com/security/home-depot-confirms-data-breach-but-gives-few-details.html

and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) counsel for Plaintiff and Defendant; (4) persons who properly execute and file a timely request for exclusion from the class; (5) the legal representatives, successors or assigns of any such excluded persons; (6) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendant; and (7) any individual who contributed to the unauthorized access of Defendant's database.

44.     **Numerosity:** The exact number of the members of the Class is unknown to Plaintiff at this time, but on information and belief, there are thousands of businesses in the Class, making joinder of each individual member impracticable. Ultimately, members of the Class will be easily identified through Defendant's records.

45.     **Typicality**: Plaintiff's claims are typical of the claims of all the other members of the Class. Plaintiff and the Class members sustained substantially similar damages as a result of Defendant's uniform wrongful conduct, based upon the same transactions that were made uniformly with Plaintiff and the public.

46.     **Adequate Representation**:  Plaintiff will fairly and adequately

represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so.  Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

47.   **Superiority**:  This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable.  Individual litigation of other Class members' claims is economically infeasible and procedurally impracticable.  Class members share the same factual and legal issues and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues.  Class treatment will also permit smaller class members to litigate their claims where it could otherwise be too expensive or inefficient to do so.  Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

48.   **Commonality and Predominance**:  There are many questions of law

and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class.  Common questions for the Class include but are not limited to the following:

(a)      Whether Home Depot owed a duty to Plaintiff and members of the Class;

(b)      Whether Home Depot failed to use reasonable care and commercially reasonable methods to secure  and safeguard its customers' PII;

(c)      Whether Home Depot's conduct resulted in the unauthorized breach of its computer systems containing consumers' PII;

(d)      Whether Home Depot failed to encrypt customer payment card data;

(e)      Whether Home Depot's conduct described herein was negligent;

(f)      Whether the harm to Plaintiff and the Class was foreseeable; and

(g)      Whether Plaintiff and members of the Class are entitled to injunctive relief, damages and the measure of such damages.

49.    **Policies Generally Applicable to the Class**:  Home Depot has acted

and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class.

50.     Plaintiff reserves the right to revise the definitions of the Class based on further investigation, including facts learned in discovery.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

51.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

52.     Home Depot owed a duty to Plaintiff and members of the Class to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the personal and financial information in its possession from being compromised, lost, stolen, accessed and misused by unauthorized persons. This duty included, among other things, designing, maintaining, and testing Home Depot's security systems to ensure that customer personal and financial information in Home Depot's possession was adequately secured and protected. Home Depot further owed a duty to Plaintiff and members of the Class to implement processes that would detect a breach of its security system in a timely manner and to timely act upon warnings and alerts, including those generated by

its own security systems.

53.     Home Depot owed a duty to Plaintiff and members of the Class to provide security, consistent with industry standards and requirements, to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the personal and financial information of Home Depot customers who used credit and debit cards to make purchases at Home Depot stores.

54.     Home Depot owed a duty of care to Plaintiff and Class members because the substantial losses incurred by the businesses resulting from a massive security breach were foreseeable and Plaintiff and the Class were probable victims of any inadequate security practices. Home Depot solicited, gathered, and stored the personal and financial data provided by its customers to facilitate sales transactions.  Home Depot knew it inadequately safeguarded such information on its computer systems and that hackers routinely attempted to access this valuable data without authorization.  Home Depot knew that a breach of its systems would cause damages not only to its customers but to the businesses, and Home Depot had a duty to adequately protect such sensitive financial and personal information.

55.     Home Depot owed a duty to timely and accurately disclose to Plaintiff and members of the Class that their cardholders' PII had been or was reasonably

believed to have been compromised. Timely disclosure was required, appropriate and necessary so that, among other things, Plaintiff and members of the Class could take appropriate measures to monitor their account information for fraudulent activity, and take other steps to mitigate or ameliorate the damages caused by Home Depot's misconduct.

56.    Home Depot knew, or should have known, of the risks inherent in collecting and storing the PII of customers who used credit and debit cards to make purchases at Home Depot stores, and of the critical importance of providing adequate security of that information.

57.    Home Depot's own conduct also created a foreseeable risk of harm to Plaintiff and members of the Class.  Home Depot's misconduct included, but was not limited to:

    a.  Its failure to take the steps and opportunities to prevent and stop the data breach as set forth herein; and

    b.  Its decision not to comply with industry standards for the safekeeping and maintenance of the personal and financial information of Plaintiff's and Class members' cardholders.

58.    Home Depot breached the duties it owed to Plaintiff and members of the Class by failing to:

a. Exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the personal and financial information of Plaintiff's and Class members' cardholders;

b. Properly implement technical systems or security practices that could have prevented the loss of the data at issue;

c. Properly maintain their customers' sensitive personal and financial information. Given the risk involved and the amount of data at issue, Home Depot's breach of its duties was entirely unreasonable;

59.     Home Depot breached its duties to timely and accurately disclose that Plaintiff's and Class Members' cardholders' personal and financial information in Home Depot's possession had been or was reasonably believed to have been, stolen or compromised.

60.     Home Depot's failure to comply with its legal obligations and with industry standards and regulations, such as PCI DSS, and the delay between the date of intrusion and the date Home Depot disclosed the data breach further evidence Home Depot's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' cardholders' personal and financial information in Home Depot's possession.

61.     But for Home Depot's wrongful and negligent breach of its duties

owed to Plaintiff and members of the Class, their cardholders' personal and financial information would not have been compromised.

62. The injury and harm suffered by Plaintiff and members of the Class as set forth above was the reasonably foreseeable result of Home Depot's failure to exercise reasonable care in safeguarding and protecting their cardholders' personal and financial information within Home Depot's possession. Home Depot knew or should have known that its systems and technologies for processing, securing, safeguarding and deleting Plaintiff's and Class members' cardholders' personal and financial information were inadequate and vulnerable to being breached by hackers.

63. Plaintiff and members of the Class suffered injuries and losses described herein as a direct and proximate result of Home Depot's conduct resulting in the data breach, including Home Depot's lack of adequate reasonable and industry-standard security measures. Had Home Depot implemented such adequate and reasonable security measures, Plaintiff and Class members would not have suffered the injuries alleged, as the Home Depot data breach would likely have not occurred.

64. Home Depot invited cardholders of Plaintiff and members of the Class to use their credit or debit cards in making purchases at Home Depot stores,

including during the period of the Home Depot data breach, with the mutual understanding that Home Depot had reasonable security measures in place to protect its customers' personal and financial information. When Home Depot finally notified shoppers of the massive data breach, it advised them that the financial institution that issued customer payment cards are responsible for any fraudulent charges.

65.    Home Depot's conduct warrants moral blame, as Home Depot continued to take possession of Plaintiff's and Class members' cardholders' personal and financial information in connection with Home Depot sales knowing, and without disclosing, that it had inadequate systems to reasonably protect such information and even after Home Depot received warnings and alerts, that the data breach had occurred and was ongoing, and Home Depot failed to provide timely and adequate notice to Plaintiff and members of the Class and their cardholders as required by law.

66.    Holding Home Depot accountable for its negligence will further the policies underlying negligence law and will require Home Depot and encourage similar companies that obtain and retain sensitive consumer personal and financial information to adopt, maintain and properly implement reasonable, adequate and industry-standard security measures to protect such customer information.

67.    As a direct and proximate result of Home Depot's negligent conduct, Plaintiff and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Prepaid Technologies LLC, individually and on behalf of the Class, prays for the following relief:

A.    Certification of this case as a class action on behalf of the Class defined above, appointment of Prepaid Technologies LLC as Class representative, and appointment of its counsel as Class counsel;

B.    Injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the members of the Class, including, *inter alia*: (i) an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein; and (ii) requiring Defendant to protect all data collected through the course of its business in accordance with industry and other applicable standards;

C.    An award of appropriate damages to Plaintiff and the Class in an amount to be determined at trial;

D.    An award to Plaintiff and the Class of their reasonable litigation expenses and attorneys' fees;

     E.     An award to Plaintiff and the Class of pre- and post-judgment interest, to the extent allowable; and

     F.     An award of such other and further relief as equity and justice may require.

## JURY TRIAL

     Plaintiff demands a trial by jury for all issues so triable.

December 15, 2014         Respectfully submitted,

                         */s/ Ranse M. Partin*
                         Ranse M. Partin **GA Bar No. 556260**
                         CONLEY GRIGGS PARTIN LLP
                         1380 West Paces Ferry Road, N.W.
                         Suite 2100
                         Atlanta, GA 30327
                         Telephone: (404) 467-1155
                         Facsimile: (404) 467-1166
                         Ranse@conleygriggs.com

                         Robert N. Kaplan
                         Frederic S. Fox
                         KAPLAN FOX & KILSHEIMER LLP
                         850 Third Avenue, 14th Floor
                         New York, NY  10022
                         Telephone:  (212) 687-1980
                         Facsimile:   (212) 687-7714
                         rkaplan@kaplanfox.com
                         ffox@kaplanfox.com

                         Laurence D. King

Linda M. Fong
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone:  (415) 772-4700
Facsimile:   (415) 772-4707
lking@kaplanfox.com
lfong@kaplanfox.com

R. Bryant McCulley
Stuart H. McCluer
MCCULLEY MCCLUER PLLC
2113 Middle Street, Suite 208
Sullivan's Island, SC 29482
Telephone:  (205) 238-6757
Facsimile:  (662) 236-1401
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com

Attorneys for Plaintiff
PREPAID TECHNOLOGIES LLC

## **<u>CERTIFICATION</u>**

The undersigned hereby certifies, pursuant to Local Civil Rule 7.1D, that the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in Local Civil Rule 5.1B.

/s/ *Ranse M. Partin*
Ranse M. Partin **GA Bar No. 556260**
CONLEY GRIGGS PARTIN LLP
1380 West Paces Ferry Road, N.W.
Suite 2100
Atlanta, GA 30327
Telephone: (404) 467-1155
Facsimile: (404) 467-1166
Ranse@conleygriggs.com